The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is not sitting. God save the United States and this Honorable Court. All right, be seated, please. All right, the first case we're going to hear this morning is Herlihy v. DBMP. And Mr. Ruckdeschel, we'll hear from you first. Thank you, Your Honors, and may it please the Court. Jonathan Ruckdeschel on behalf of the appellants. In denying the appellant's motion for relief from the automatic stay, the bankruptcy court committed an error of law when it failed to properly apply the legal standards governing relief from the automatic stay for cause under 11 U.S.C. 362d1. The court failed to apply the burden of proof under 11 U.S.C. 362g and changed the rule of the Robbins case for evaluating cause for live stay from evaluating harm to the estate to harm to the proceeding as reflected on page 1 of the appellant's brief. All right, so the change is from estate to proceeding. The court also failed to consider the impact of the debtor's admitted lack of financial distress and the implications of that with respect to the good faith of the bankruptcy filing itself when making its ruling. The court further made numerous clearly erroneous purported findings of fact that Because no cognizable harm to the estate was established by the debtor who admits it can pay all of its creditors in full, and because Congress squarely allocates the burden of proof on resisting a motion to lift stay on the debtor under 11 U.S.C. 362g, stay relief was required under 11 U.S.C. 362d's mandatory language. We ask that the Court reverse the bankruptcy court's order, and because the relevant facts are not in dispute, we ask that this Court grant appellant's motion for limited stay so that they can liquidate their claims before a jury and submit the value of their claim in this bankruptcy proceeding only to return and await the conclusion of the bankruptcy proceeding. We've never asked and are not asking for the right to collect on that judgment, simply to liquidate the claim and know how much my clients are owed, to have their day in court. I'd like to briefly discuss the congressional purpose for the bankruptcy code in the court, the way that this Court can and must evaluate the question of cause under 362d. I'd then like to review the evidence before the bankruptcy court and the Court's legal and factual errors deciding appellant's motion for relief from stay. And I'd like to conclude with a discussion of why it's critical that this Court address the elephant in the room, right, whether these nondistressed Texas two-step tort reform bankruptcies are a proper use of the bankruptcy court. Do you say the bankrupt was not in distress? Absolutely. It's not disputed. It's been found by the bankruptcy court. Well, when you look at the congressional statement as to when they enacted 524G, they were overtly imitating and mimicking Mansfield case and implemented it almost per se. And they said that the issue in that case was the stress created by the long manifestation of the disease that would linger over these corporations and hurt them not only the claimants but the company and the public. And they explained that in some detail. And they called that they described that as the stress that they were addressing. And they made clear that the claimants would do well, fine, because of the trust fund that was created and which was guaranteed. So should we ignore that articulated purpose? I mean, it's not in the statute, but the statute was peculiarly addressing the asbestos situation where the asbestos develops over or mesothelone develops You can help me out. Mesothelone.  Mesothelone. Thank you. That develops over sometimes 40 years. And so the tale of or the long tale of claimants is the stress they were talking about. And they described how that affected corporations and the ongoing welfare of the claimants and the corporation. And so I guess you want us to just, I guess, ignore that or no? Absolutely not, Your Honor. And I think this is a great example of how the bankruptcy court had glossed by the whole picture. Because you're absolutely right that the description of why the conundrum that the bankruptcy court initially addressed in John's Manville arose is because of the long latency of asbestos diseases. But the reason that it was necessary to enact a trust solution to the John's Manville issue was because John's Manville was financially distressed and there wasn't enough money to pay current and future claimants. But the Congress made clear that the stress in this case is not defined the way you apparently define it. In other words, it's not insolvency. As you know, Chapter 11 requires insolvency only with respect to municipalities and does not with respect to other entities that are in Title XI. The qualifications for Title XI are set forth in the provisions. And I'm not sure even in Mansville at that point they were insolvent. But they didn't focus on that. They clearly focused, and they said this explicitly, the stress comes from the fact that these, this liability is going to stretch out for up to 40 years and both hinder procedurally and economically the corporation. And there was no hurt to the claimants because they were all being treated the same through the trust fund. And the trust fund, of course, here is going to be guaranteed by new certainty, right? So that's true. You know, where Your Honor is not quite finishing the loop with respect to the legislative history is in the same legislative history. Congress makes clear that it's enacting 524G for companies that are facing, in its words, similarly overwhelming asbestos liabilities, right? Not any. That's right. In terms of numbers of potential claims. No. And that's what they talked about. They talked about the numbers of claimants. And in this case, we have, what, evidence, 60,000? So this one actually may be more than some of the Mansfield claims. So in terms of number of claims that are pending in the court system, that's absolutely true. In terms of number of claims that are actively being litigated, the record evidence, which is established at Joint Appendix 96 in the debtor's own filings with the bankruptcy court, show that the debtor had a predictable stream of about 1,400 cases a year that were being filed against it, 60 percent were being dismissed without payment by the court, 20 percent being paid a nuisance amount of less than 50,000. But they don't even know all of them. I mean, that's the problem. That's the whole purpose of 524G, is they don't know them all. There are cases potentially down the road. There may be some pending. It's not a question of what the current status is of the number. It's a question of the potential liability that stresses both the claimants, because there may not be money for them, and the company, where there may not be money for it. And so Congress addressed that stress. That's they define that explicitly in their. So I understand Your Honor's point, right? I don't believe that that is a complete reading of the legislative history regarding 524G. I'll go back and read it again. Because what Congress says explicitly is what we're trying to do is make sure everybody understands that what was done by the bankruptcy court in Johns Manville is okay. We're trying to enshrine that to remove any uncertainty from any future companies overwhelmed, facing with overwhelming asbestos liabilities. Not overwhelming number of claims. Overwhelming liabilities. That's the phrase that Congress used.  They use that, but they also, they define that by the number of claimants. They kept referring to the numbers. I think there was between, what, 30,000 to 100,000 or something, they predicted. It was much lower. I think there were 12,000 claims. Well, they had a big range. I can't recite the statutory history. But my point is the statutory history focuses on the stress created by the indeterminacy of the claims at this point. And, Your Honor, I simply disagree with that in terms of what the overall reading of the statutory history is, because the statutory history cannot be cut apart from what it's referring to when it says we're trying to enshrine what happened in Johns Manville. Well, let me add to this. If you're right, let me flow with you for a minute. If you're right, I guess then we can't use, in a circumstance we have like here, we can't use 524G. You want to lift the stay. The claimants will go ahead, so the benefits of 524G will not be realized. And or you want us to go further and even find unconstitutional or violate and I don't know what, what remedy would you want? You want to lift the stay, but. The request, all we're asking for here, Your Honor, is the request to lift the stay so my client can complete their claim. So the claimants would then go into courts around the country and pursue their claims over the period of years and they'd keep filing them, right? That's what would happen. Well, no. We're only seeking relief. And they talked about 60,000. We're only seeking relief from stay for my two clients, the Hurleys and the Burghers. And there's no evidence that anyone else is going to seek review, seek to have the stay lifted, because there's a significant risk in this, because my clients would go and liquidate their claim. They're going to come back to the bankruptcy court and await its conclusion, which the debtor is still going to try and have a 524G plan. But that would frustrate Congress's explicit purpose of making the claims treated equally, to treat your clients in one way and to treat the other claimants in a different way. So that, again, I believe, Your Honor, is passing the step of Manville being a situation where there wasn't enough money to pay current and future claimants. And that was the whole point, right? The whole point of 524G codifying what happened in Manville is we're going to set some money aside for future claimants because there's not enough money to pay present and future claimants, right? There was a limited fund, right? And in the absence of a limited fund, the rights of future claimants cannot be impaired with respect to their jury trial rights under the Seventh Amendment, because they're not before the Court. This is the conclusion of Amchem and Ortiz, right? So with respect to what we're asking for, we want the right to liquidate our claim, and it sets the value for my client. Now, the implications of that, if a plan is ever proposed and six years in, it's not. And a plan is ever sent out for votes and six years in, nothing has happened. And if a plan is ever approved, well, then we'll fight on whether it can be confirmed and what the implications are of my client liquidating their claim flow from the statute. Can I just ask you a question again about the remedy you're asking for? Because it does seem like there's kind of a mismatch, right? Your basic position is this case does not belong in bankruptcy. But if you prevail, the case stays in bankruptcy, and it's just that if the bankruptcy judge is right, like, all the benefits of that disappear, because now you've got 60,000 claims working their way through the tort system. I understand you're only asking for two people, but I'm, for purposes of this question, assuming the district court's prediction was correct. Isn't that an odd outcome? You think this case shouldn't be in bankruptcy, but at the end of the day, the case will be in bankruptcy, but without any of the benefits of bankruptcy. I think the best answer to that is phrased in the context of my two clients. Right? Mr. Hurley, he is a living means of the ilioma victim. Right? He is literally living on borrowed time. He wants his day in court. That is his right. Right? And Congress has carved personal injury claimants out of the bankruptcy code. They're the only types of creditors that are absolutely entitled under 28 U.S.C. 157 to have a jury trial to quantify their claim. Right? That is an absolute right guaranteed by Congress. In California, where Mr. Hurley, he lives, he has a state law right to an expedited trial. He's a living means of the ilioma victim. Given his age and his condition, he can get the trial in 90 days. Right? So, so if the stay is lifted, the Hurleys, and I spoke with Mrs. Hurley yesterday. She's a court reporter, and she knows this process. She wants her day in court. Right? They can ask, as soon as the stay is lifted, they can ask the California court for a trial date. They'll get one 90 days out. They can go. They can liquidate their claim. Maybe they win. Maybe they lose. Maybe they settle with certainty. Right? In A.H. Robbins, in footnote 17, the court notes that under 157B, when a case is referred out for The proposition that if you lifted the stay for everybody, you'd have 60,000 cases going to the verdict. I mean, you're making a case for whether Congress should have passed 524G. Absolutely not. But if 524G is there and is to be enforced, you have to argue why your clients aren't under 524G. So, so, Your Honor, I don't believe that's correct. And I think all you need to do is look at 524G7. Right? Which specifically says nothing in the enactment of 524G changes the system of referring cases to the bankruptcy court through the district court under 28 U.S.C. 157, which is the section of the code that preserves my client's right to liquidate their claim in front of a jury. Right? And so Congress, in enacting 524G, says we're not changing this system. We're not changing the rights of personal injury claimants to liquidate their claim. And, again, personal injury claimants are the only type of predator in bankruptcy that is allowed an absolute right to liquidate their claim in front of a jury. And any argument of the subclass of those persons who are persons suffering from asbestosis that Congress addressed. In other words, they made the asbestosis claimants a special class and treated them in a special manner. No. They created it. So, Your Honor, Congress created a remedy. 524G is a remedy for. The whole process. The whole process. It is, for companies that are properly in bankruptcy. And the purpose of Chapter 11 is to allow for the rehabilitation of financially distressed companies. If we look at. Yeah. I see your time's up. Why don't you bring this up on rebuttal. Yeah. Yes. Thank you, Your Honor. Yeah. All right. Mr. Marshall. Good morning, Judge Niemeyer. May it please the Court. I'm Kevin Marshall representing the debtor. The grants for affirmance here are quite straightforward. Everyone agrees the Robbins balancing test applies. It just requires the Court to balance two things. Potential prejudice to the estate against future hardship to the movants. And then that requires the Court to balance two things. Review of that balancing is then under an abuse of discretion standard, which is why this Court has affirmed unanimously in all four cases it's decided under the Robbins test. Here the bankruptcy Court recognized its task under the Court's precedent. It expressly carried it out. It gave reasons. And it made no error of fact. It did exactly what it should have done, very far from abusing its discretion. And I'd like to directly respond to your question, Judge Niemeyer, as well as yours, Judge Harris. The Mandel case led to 524G. 524G itself identifies financial thresholds for qualifying for a plan. So Chapter 11 itself imposes no financial requirements, unlike Chapter 9 as well as Chapter 13. We get past that basic aspect of Chapter 11, we get to 524G. And what 524G says, what Congress actually enacted, distilling the general approach of Mandel, was that 524G is available to a debtor who has been named as a defendant in asbestos cases, likely to be subject to substantial future demands for payment. The amount, number, and timing of those cannot be determined. And if we don't address this through a bankruptcy plan, we're not going to be able to resolve all of the claims. There's actually no dispute. One of the few things not disputed in this case is that we are in a situation where we qualify for pursuing relief under Section 524G. That is our purpose in pursuing bankruptcy. If we can't do it through a trust, then, as you pointed out, Judge Niemeyer, the claims here will be liquidated differently. The whole point of 524G is to be able to consistently and equitably liquidate the claims across all of them. Current, we have 30,000 current claims against this. That's just the active ones. Half of them have been lasting for 10 years old. We have an untold number of future claims that will likely be in the thousands and run for decades. So if we grant lift-stay relief here, then what is the argument for not granting it in the next case, in the next motion to lift-stay? It creates a bind for the bankruptcy courts. The court below pointed this out. What about the Seventh Amendment? That's the argument, that these folks have a right to a trial under the Seventh Amendment of the Constitution. And the bankruptcy court didn't address the allegation of bad faith for going into bankruptcy in the non-estate request, the estate request. Let me address those in reverse order, if that's okay, Judge King. The bankruptcy court actually did. So we're under the umbrella of the Robbins balancing test. Here, the basis for relief is not specific to these creditors. It's that the whole case is bogus. And this court has a rule for deciding whether the whole case is bogus, if I can use that term of art. It's the Caroline Standard. And under the Caroline Standard, if the case is not objectively futile, it was not filed in bad faith. But beyond that, the bankruptcy court here actually did consider the question of subjective bad faith in filing. And he spent two pages explaining why he was unwilling to find that here. But on the Seventh Amendment, Your Honor, there's no Seventh Amendment issue at all. And Mr. Rupteschel effectively admits that in his brief because there's a Federal statute that says you have a right to a jury trial in a Federal district court on your claim. But in bankruptcy, first you finish the bankruptcy, you set up the trust, the trust provides essentially a settlement offer, and if you turn that down, yes, you can have your trial. There's no Seventh Amendment problem here at all. That's how Section 524G plans have been operating since 1994. There's been over 60 of them. They always protect the jury trial right, and no court has ever seen a Seventh Amendment issue. Can I actually just ask you to clarify something you just said about what the bankruptcy court did with respect to subjective good faith? You understand the Court to have said not I won't consider the question, but rather I am not willing to find subjective good faith on this record at this time. He said I'm not – I can't find subjective bad faith in filing the case.  Sorry to use so many words. Yeah, yeah. It's kind of unclear. I can't find subjective bad faith in filing on this record and in this posture. Yeah. And he spent two pages, that's J921 to 23, explaining why, and I'll elaborate on that a little bit. The main argument – we hear the phrase subjective bad faith in filing a lot in this case, but that's actually just a label for two particular aspects of the case. The alleged lack of financial distress here – we actually do have financial distress, and I can come back to that – and the fact that we, before the bankruptcy, we did a corporate restructuring, which is something that 524G contemplates. And what the argument is is those two facts make what the bankruptcy court called per se bad faith in filing, or in the opening brief, subjective bad faith in filing as a matter of law. That's a very odd concept when the whole question is what is our motive? What was our state of mind? So it's not actually answering that question. And that's one of the reasons, and the primary reason the bankruptcy court – I'm not going to find it on this record. But another aspect of it is how are we going to know there was something bad about the corporate restructuring? Well, the argument is that it was a fraud. And the court said, well, I can consider that more fully in these three adversary proceedings I've authorized, and the whole point of those is to consider the state of the bankruptcy globally. And that makes a lot more sense than trying to adjudicate that question in the context of two individual claimants' piecemeal motions. And beyond that, in the corporate restructuring – and this is one of the ironies and oddities of this case – the argument is actually that we're insolvent. So here you're hearing we don't have financial distress. There you're hearing we're insolvent. And the judge is like, I don't know, but the better way to reach a definitive decision on whether there was a fraud is in these three adversary proceedings that I've authorized, and they're continuing on. Let me briefly talk about the financial distress. Again, it's not required by Chapter 11. It's not required by Carolyn. If the question is do we meet 524G, I think it's actually undisputed that we do. But we've had 300,000 claims against us in the past, 60,000 pending, 30,000 active when this case was filed. It's undisputed there will be tens of thousands for decades to come. Spent $2 billion on asbestos litigation over the last 20 years. 524G, at least for its own context, defines what kind of financial problems Chapter 11 exists to address. We easily meet that. And it's not the case here that the bankruptcy court held we lacked financial distress. It's not been resolved. Maybe it will be resolved in the adversary proceedings. But it wasn't necessary to reach a full decision on that to deny the motions here under the Robbins balancing test. Again, prejudice to the estate balanced against future harm to the movements. What we essentially have here is an argument that prejudice to the estate should count for zero because there shouldn't be an estate because the whole case is bogus. And that's where the Carolyn analysis comes in. And the court did it. The case is not objectively futile. For purposes here, there's not subjective bad faith in filing. Anything further? I'll just address one other thing, which is the question of the next motion, which I briefly talked about with Judge Harris. I just want to point out that the motion here is a copycat of motions that were filed and denied in Bessewell and in Aldrich. There was two in each of them. And they're, frankly, copycats of one another. It's not hard from that basis to recognize that if this motion is granted, the bankruptcy judge will have no reasonable basis to deny the next motion. And there's 30,000 claimants who can bring that. We also know the basis for the motion here has nothing to do with the specific facts of a particular claim. That's the phrase of this Court in the Bessewell decision. They're openly attacking the case as a whole, which means they're raising arguments that any of the 30,000 other claimants could raise. And then the last point. All they had to show was cause, according to the statute. Is that right? They did have to show cause. And the Robbins balancing test explains what that means and how it's worked out. The bankruptcy court balances potential prejudice to the estate against future harm to the movements. It's done under the clear air standard for facts, use of discretion review. If it's a good-faith bankruptcy. It is possible to seek to lift the stay by arguing that the bankruptcy case was filed in bad faith, which means does it meet the Carolyn test? In this circuit, bad faith in filing bankruptcy is determined under Carolyn. It's undisputed. And that's the way. It's not a planned confirmation, right? A planned confirmation, Carolyn, is not the standard, is it? I thought a planned. Did I say confirmation? No, you didn't. You said in bankruptcy. And I'm. The question whether the case was filed in bankruptcy is decided in this circuit under the Carolyn test. A confirmation, there's actually a statutory requirement that you need to propose your plan in good faith. Okay. We're not there yet.  Slightly different. So you're not saying that at confirmation, Carolyn would apply? Correct. If there are no questions, I have nothing further. Thank you, Your Honors. Thank you. All right. Mr. Ruck. Thank you, Your Honors. With respect to the legislative history, Your Honor, when we look at the legislative history and the description in the report regarding the purpose for enacting 524G, Congress cites in its discussion of Section 111 bankruptcy court agendas, cites both the Cain v. Johns Manville, the Second Circuit decision that talks about Johns Manville being a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future. So there was a crisis of liquidity that was facing Johns Manville that was going to cause the entire enterprise to collapse. And what the Court then says, I'm sorry, what Congress then says. You mean crushing debt? Yes. Can be translated into insolvency? So it wasn't insolvent yet. I know it wasn't. It was facing insolvency, and that was the financial distress that allowed it to be promised. Well, it was facing crushing debt. That's what they observed. But the point was the that is described in more detail about the nature of the number of claims that they will keep coming, they're unpredictable, and they didn't know the amount. And Congress thought that is the stress that they're the indeterminacy and the string out of the claims is what Congress was focusing on. It was all anchored, Your Honor, however, by the fact that this was going to potentially cause Manville to collapse, right? The claimants are ill- this is right from the legislative history, Your Honor. The claimants are ill-served if Johns Manville and other asbestos companies are forced into liquidation and lose their ability to generate stock value and profits to satisfy claims. And then two paragraphs later is when I talk about this being available for people facing overwhelming asbestos liabilities. So the legislative history is all tied. They cite to Cain, they cite to the description of the district court of the financial pressures, right? It's all tied back to the fact that there wasn't enough money. And that's financial distress, and that's what is the ultimate purpose of the Bankruptcy Code. If we look at the Bankruptcy Reform Act and we look at the legislative history from 1978, Chapter 11 reorganization, the first sentence, Chapter 11 deals with the reorganization of a financially distressed business enterprise providing for its rehabilitation by adjustment of its debt obligations and equity interests. You have to have a financially distressed business enterprise in need of  There is no dispute in this case that DBMP, Certainty Stooge Bankruptcy Fall Guy, is never and has never been in need of rehabilitation. It has, it admits it has, and the Bankruptcy Court has found that it has, enough money to pay all of its asbestos liabilities in full. That includes present, that includes future. There is no financial distress here. If we look at how this Court has interpreted financial distress, right? In Carolin, the objective futility inquiry is designed to ensure there is embodied in the petition some relation to the statutory objective of resuscitating a financially troubled debtor. DBMP has never been a financially troubled debtor. It is not and never has been in need of resuscitation. To the contrary, the Bankruptcy Court found and the debtor admits that old Certainty was a profitable overcapitalized going concern that easily managed financially its asbestos liabilities in the tort system. It filed this petition for the purpose of paying less. That's not what 524G is about. It's not what the Bankruptcy Court is about, right? Judge Whitley found that specifically in paragraph 37 of his opinion in the preliminary injunction decision, which is in the record here and we've cited throughout our case. So there is no financial distress. Let's look how this Court looked at financial distress in Premier Auto, right? Citing Little Creek from the Fifth Circuit. The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with waiting space in which to return to a viable state, right? DBMP has never been a financially distressed business enterprise. It has never required breathing room to return to a viable state because it has always been viable, right, as old Certainty was. Not just viable, massively profitable. And there are findings in the record in Judge Whitley's findings that since the two-step, the Certainty Enterprise, which backstops DBMP through the funding agreement, has gotten only more profitable, Your Honor. You didn't file a motion opposing the petition, did you? Or did you? No. My clients weren't even diagnosed with mesothelioma when this petition was filed. All right. So it seems to me the time to raise that would be when you, when the petition was filed under Chapter 11 to oppose it. But here the narrow issue is whether two claimants ought to have the stay lifted as to them. That's the issue, right? You pointed that out to us. My time is up. May I respond? Please. Okay. So, Your Honor, I disagree that that's the issue. The issue is, will there be harm to the estate as recognized in the concept of discussion of harm to the estate? I thought the issue was whether Judge Whitley abused his discretion in denying the stay. It absolutely is. And that's what's on appeal. It's whether he abused his discretion and applied the proper standard of law, which he did not. And if we look at this question of whether the estate was lifted. He abused his discretion by definition.  And but we, this Court looks at misapplications of the controlling law and the code. But the application for a stay, the motions for a stay are reviewed for abuse of discretion. Agreed, when the proper standard of law is applied. And he missed it here. Absolutely. In how many respect? So the Court failed to enforce the burden of proof that's specifically allocated to the debtor resisting the motion to lift stay under 362G. So Congress has said the debtor has to come in and prove the lack of cause when it's raised. Unless the issue is equity in the property, which is, everybody agrees, isn't that issue here. So for example, if we stick with this question of financial distress, which my colleague has acknowledged is grounds for lifting the stay if found, potentially, right, where bad faith is. Then, then, if the judge is unable to make the call, as Judge Whitley said, I can't determine whether it's a good faith filing or a bad faith filing. Under the burden of proof allocated against the debtor, we went on that issue. This goes back to. The burden of proof was on the debtor. Absolutely. That Congress, Congress has said. And the debtor didn't offer anything. There was no evidence offered. There was no evidence of any harm to the estate. The debtor never produced any evidence saying if you allow liquidation of these claims, we won't have enough money to pay other people. Right? In full. There's no claim of that because it's been decided to the contrary. There's no claim. Well, our executives will be distracted from reorganizing by having to follow what's going on. And they can't do that because DVMP is a passive holding company with no active businesses and one full-time employee who simply monitors what's going on in the bankruptcy case. Right? So, so there's nothing to distract them from. They're not trying to reorganize because the Texas Two-Step did all of the corporate reorganization that would ordinarily happen in Chapter 11 before the petition was filed. That's why the Texas Two-Step compounds the bad faith so much. Right? Because they've taken all of the reasons for Chapter 11 and just bypassed them. There's no need to resuscitate or reorganize a financially troubled debtor because they're not financially troubled and they've already reorganized. What they're using, as, as Your Honor pointed out in, in the decision earlier this year, they're using this as an opportunity to improperly invoke the automatic stay and to force judicially compelled negotiations by my clients to accept. Counsel, can I just, if, so in, I think the first Bestowal case, I mean, I, I do understand your argument. In the first Bestowal case, though, right, we said, no, there's a perfectly legitimate business justification for this. Like, I, I just, I feel that part of what the bankruptcy court was saying here is, as I'm reading the Fourth Circuit, this is not per se bad faith, and we know that from the first Bestowal decision. So, I'm delighted that you brought that up. I'm so glad. Because, because Judge, because Judge Beyer in the bankruptcy court specifically did not reach the question of subjective bad faith. Well, that sounds related. I read it a little bit. And this Court, when discussing, I'm sorry. No, go ahead. This Court, when, when discussing the preliminary injunction global lift stay motion that was the Bestowal I decision, as I'll call it, right, specifically says we are not faced with the question of whether this is a bad faith filing, and we're not faced with the question of the implications of a lack of financial distress. That decision expressly does not consider this, right? And there's, there's some, there's a passing reference in Judge Quattlebaum's decision earlier this year that, that, that the bad faith issue has already been decided by the, by the underlying court. But it hasn't, right? Judge, Judge Beyer specifically declined to reach the question of bad faith in the dismissal motions in Bestowal. Judge Whitley specifically declined to reach the question of bad faith in Aldrich Murray in a motion that I filed, right? This Court has declined review of that question twice, both on the dismissal issues and on the question of bad faith. Neither the Bankruptcy Court nor this Court has ever reached the question of the elephant in the room. Is this a proper use of bankruptcy? Thank you, Your Honor. Thank you. We'll come down and greet counsel and move on to the next case.
judges: Paul V. Niemeyer, Robert B. King, Pamela A. Harris